IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MONTANA

BILLINGS DIVISION

| | |
|---|---|
| JASON PAUL INDRELAND, | CV 08-047-BLG-RFC-CSO |
| Plaintiff, | |
| vs. | ORDER AND FINDINGS AND RECOMMENDATION OF UNITED STATES MAGISTRATE JUDGE RE: DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT |
| JAY BELL, SETH WESTON, DENNIS MCCAVE, LT. NEITER, SGT. PLUHAR, SGT. WONG, SGT. VALDEZ, CHAPLAIN KINSER, OFFICER PETERSON, OFFICER BUTKE, and OFFICER MILLER, | |
| Defendants. | |

At issue are two motions for summary judgment: (1) Defendant

Kinser's Motion for Summary Judgment (Court Doc. 32); and (2)

Defendants Bell, Weston, McCave, Neiter, Pluhar, Wong, Valdez,

Peterson, Butke, and Miller (hereinafter County Defendants)'s Motion

for Summary Judgment (Court Doc. 35).

# I.  STATEMENT OF THE CASE

## A.    Parties

Indreland is a state prisoner incarcerated at Montana State Prison in Deer Lodge, Montana.  At all times relevant hereto, Indreland was incarcerated in the Yellowstone County Detention Facility.

The Defendants are:  Jay Bell, Sheriff of Yellowstone County; Seth Weston, Yellowstone County Undersheriff; Dennis McCave, Commander of the Yellowstone County Detention Facility; Lieutenant Neiter; Sgt. Pluhar; Sgt. Wong; Sgt. Valdez; Chaplain Kinser; Officer Petersen; Officer Butke, classification officer; and Officer Miller, classification officer.[1]

## B.    Indreland's Allegations

Indreland alleged four claims regarding the free exercise of religion:  (1) he was denied his Satanist medallion, (2) he was denied access to a Satanic Bible or Book of Satanic Rituals, (3) the detention

_____

[1]Yellowstone County Sheriff Chuck Maxwell was originally named in the Amended Complaint but he died during the pendency of this action. Yellowstone County filed a Substitution of Parties on August 4, 2009 substituting Sheriff Jay Bell for former Sheriff Maxwell and Seth Weston as the new Undersheriff for Yellowstone County.  (Court Doc. 29).

center staff placed Christian greeting cards under his cell door, and (4) he was held in maximum security due to his religious beliefs.

These claims have been construed as allegations of interference with Indreland's right to the free exercise of religion in violation of the First Amendment and claims under the Religious Land Use and Institutionalized Persons Act of 2000 ("RLUIPA").

Indreland alleged Defendants Maxwell (now Bell), Bell (now Weston), McCave, and Kinser were responsible for the unwritten policy concerning religious exercise and for the lack of training of officers regarding Indreland's religious rights.  Indreland argues Defendants Neiter, Wong, Pluher, and Valdez denied his requests for his medallion and Satanic manuals.  Finally, he contends Defendants Butke and Miller were responsible for classifying him in maximum security based upon his religious beliefs.

Indreland also alleged a failure to protect claim under the Eighth Amendment in which he contends he told Officer Peterson that he and his cellmate had prior existing problems and that he asked for the cellmate to be moved.  The cell mate was not moved and on October 14,

2007, a physical altercation took place.  (Court Doc. 8, p. 12).

## II. STANDARD

A party is entitled to summary judgment if they demonstrate "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). Summary judgment is appropriate where the documentary evidence produced by the parties permits only one conclusion.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 251 (1986).

The party seeking summary judgment bears the initial burden of setting forth the basis of the motion and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, which demonstrate the absence of a genuine issue of material fact.  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).

Where the moving party meets this burden, the party opposing the motion "may not rest upon the mere allegations or denials of his pleading, but  . . .  must set forth specific facts showing that there is a genuine issue for trial." Anderson, 477 U.S. at 248.  The non-moving

party may do this by use of affidavits (including his own), depositions, answers to interrogatories, and admissions.

"A verified complaint may be used as an opposing affidavit under Rule 56." Schroeder v. McDonald, 55 F.3d 454, 460 (9th Cir. 1995) (citing McElyea v. Babbitt, 833 F.2d 196, 197-98 (9th Cir. 1987)). "To function as an opposing affidavit, however, the verified complaint must be based on personal knowledge and set forth specific facts admissible in evidence." Id. (citing Fed.R.Civ.P. 56(e); McElyea, 833 F.2d at 197; Lew v. Kona Hosp., 754 F.2d 1420, 1423 (9th Cir. 1985)).

A plaintiff "must produce at least some 'significant probative evidence tending to support the complaint.'" Celotex Corp. v. Catrett, 477 U.S. 317, 324, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)(citations omitted). Only disputes over facts that might affect the outcome of the suit under the governing law are "material" and will properly preclude entry of summary judgment. Anderson, 477 U.S. at 248. At the summary judgment stage, the Court does not weigh the evidence or determine the truth of the matter, but ascertains whether there is a genuine issue for trial. If the evidence is merely colorable or is not

significantly probative, summary judgment may be granted.  Anderson,

477 U.S. at 249-50.

> The mere existence of a scintilla of evidence in support of
> the [non-moving party's] position will be insufficient; there
> must be evidence on which the jury could reasonably find for
> the [non-moving party].  The judge's inquiry, therefore,
> unavoidably asks whether reasonable jurors could find by a
> preponderance of the evidence that the plaintiff is entitled to
> a verdict.

Anderson, 477 U.S. at 252.

Additionally, "[a] document filed pro se is 'to be liberally

construed,' and 'a pro se complaint, however inartfully pleaded, must be

held to less stringent standards than formal pleadings drafted by

lawyers.'" Erickson v. Pardus, 551 U.S. 89, 127 S.Ct 2197, 2200, 167

L.Ed.2d 1081 (2007) (per curiam); Cf. Fed. Rule Civ. Proc. 8(f) ("All

pleadings shall be so construed as to do substantial justice").

## III.  UNDISPUTED FACTS

Indreland was detained at the Yellowstone County Detention

Facility from March 24, 2007, until July 10, 2008.

### A.  Medallion

On March 24, 2007, Brandon Gatlin, a staff member of the

Yellowstone County Detention Facility, processed Indreland into the Facility. Indreland was not allowed to have his Satanist medallion in the Facility, but Gatlin does not remember processing Indreland into the Detention Facility or that he did not allow him to have a medallion. (Court Doc. 39–Gatlin Affidavit).

On April 27, 2007, Indreland made this request: "In my property I have a religious medallion [sic] a series of 6's. For me this is my soul. What do I have to do to get it? This certain item has protected [sic] in some very adverse situations! The same as your cross would you." Chaplin Kinser responded to the request on April 30, 2007 with the following: "Chain is too thick – per Sgt. Pluhar. Sorry! Chaplain Kinser." (Court Doc. 34-1, p. 15).

On June 8, 2007, Indreland wrote a complaint to the Facility stating: "Religious medallion – reason given for not allowed to have it (chain too thick). It is a 24" Figaro chain – same sold through instutional [sic] vendors. Have also seen same style chain allowed in here. Medallion is within the 15" margin." For the relief requested, Indreland stated: "Allowed to wear this. It is very important to me.

It's my form of protection."  (Court Doc. 34-3, p. 9).

On June 11, 2007, Sgt. Pluhar responded:  "We do not know about other 'instutional vendors.'  We do not adhere to their policies and procedures.  Our rules say the chain is too large for the units; therefore, the chain is too larger [sic] for this facility.  Have a different chain brought in and exchange the cross."  (Court Doc. 34-3, p. 9).  On June 13, 2007, Dennis McCave, the Captain of the Facility, approved Pluhar's response.

On December 3, 2007, Indreland wrote a complaint to the Facility and again requested his medallion.  (Court Doc. 34-3, p. 10).  Indreland again stated that someone else in his unit had the same chain.  On December 4, 2007, Pluhar responded to the complaint stating, "Your item does not conform to our policy; as such this item will not be allowed in the housing unit.  If you would tell the housing unit officer who this other inmate is we will check out the item in question."  On December 5, 2007, Timothy Neiter, a staff member with the Facility approved Pluhar's response.  <u>Id</u>.

On May 17, 2008, Indreland wrote two complaints to the Facility.

Indreland again requested his medallion, explained the medallion was the same to him as a cross is to a Christian, and that he is a practicing Satanist. (Court Docs. 34-3, pp. 11-12; 42, pp. 5-6).

On May 24, 2008, Pam Wong, a staff member with the Facility, responded to the complaints. Wong advised Indreland that he had made several previous complaints about the medallion and as he had been previously told, he could not have the medallion because of the thickness of the chain on the medallion. On May 27, 2008, Neiter approved Wong's response. (Court Doc. 34-3, p. 11).

On May 28, 2008, Indreland wrote another complaint requesting his medallion. Indreland claimed the chain was not too thick and other detainees had chains with a similar thickness. He stated the only difference is the medallion on the chain. The other inmates have a Christian medallion and he had a Satanist medallion. On May 30, 2008, Wong responded to the complaint. Wong advised Indreland he could not have the medallion because of the thickness of the chain on the medallion. Wong also asked Indreland to give him "the names of the three people that you know who have chains identical to the one

that you are requesting." (Court Doc. 42, p. 9). Wong stated that he would "personally check them out [and] make a comparison to yours." Wong also stated, "I don't discriminate against religions although I do not know if Satanism falls into that category." Id. On May 30, 2008, Neiter approved Wong's response.

On June 3, 2008, Indreland wrote a complaint to the Facility indicating three identical chains to his were allowed in the facility, there was no written policy on the size of the chain, and he was not going to give up any names. On June 8, 2008, Wong responded to Indreland's complaint stating, "Again, original action on this matter stands. Other Sergeants have determined this necklace to be too large. Per our facility Chaplain – Satanism is not encouraged in our facility. You will not be given your necklace nor items pertaining to Satanism. This is final per Administration." On June 10, 2008, Defendant McCave approved Wong's response. (Court Doc. 34-3, p. 13).

B. Satanic Bible

At some point in time, Indreland requested a book of satanic verses from Chaplain Kinser. (Court Doc. 34-1--Kinser Affidavit, p. 5, ¶

12).  The request was denied.

On May 17, 2008, Indreland submitted a grievance regarding his medallion which also stated, "I also around this time asked Chaplain Kinser if I could have a copy of the Satanic Bible."  Indreland stated that he was told, "No, it promotes violence." (Court Doc.  34-3, p. 12) Indreland indicated he was given permission to have one sent in a number of years ago.  In addition, he stated another inmate gave him a book entitled "Satan Wants You" with Anton Lavey on the cover.  The grievance was denied without addressing the Satanic Bible.  (Id. at pp. 11-12).

The Inmate Rules and Regulations provide that, "Religious materials, such as a bible, may be requested by submitting an inmate request form to the facility Chaplain." (Court Doc. 56-7, p. 16–YCDF Inmate Rules & Regulations).

C.  Segregation

From March 23, 2007, until June 13, 2007, Indreland was in the general population of the Facility.  On June 12, 2007, Indreland was charged with and plead guilty to fighting with another detainee.  As a

result, he was placed in a segregation unit for 14 days. (Court Doc. 58-1, pp. 10-11). On June 27, 2007, after Indreland served his 14 days in the segregation unit, Defendant Butke released Indreland from the segregation unit and placed him in the general population of the Facility. (Court Doc. 44–Butke Affidavit, p. 2).

On October 14, 2007, Indreland was again charged with and plead guilty to fighting with another detainee, Robert Walls. As a result, Indreland was placed in a segregation unit for 30 days. (Court Doc. 44–Butke Affidavit, p. 2).

From October 15, 2007 until July 10, 2008, Indreland remained in a segregation unit. On July 10, 2008, Indreland was transported to the Montana State Prison.

D.  Safety

On August 18, 2007, Defendant Verhasselt or Arnold Reiter (another staff member with the Facility), placed Indreland in the same cell as Robert Walls. Defendant Verhasselt does not remember which one of them (he or Reiter) placed Indreland in the same cell as Walls. But both Verhasselt and Reiter were the staff members in the unit

when Indreland was placed in the same cell as Walls and one of them
had to have made the initial placement. (Court Doc. 45–Verhasselt
Affidavit).

On October 14, 2007, 57 days after Indreland became a cellmate
with Inmate Walls, Indreland was charged with and plead guilty to
fighting with Walls in their cell. Defendant Butke presided over a
disciplinary hearing on the incident. The disciplinary hearing report
indicates Indreland stated, "He is disrepectful – blatant disrespect and I
could not deal with it." (Court Doc. 55-2, p. 54). Butke placed
Indreland in a segregation unit for 30 days because of the incident.
(Court Doc. 44–Butke Affidavit).

After the October 14, 2007 incident, Defendant Peterson, placed a
note in Indreland's file that he was not to be placed in the same unit as
Walls. (Court Doc. 48–Peterson Affidavit). On March 11, 2008, 149
days after the incident, Indreland wrote a note to the Facility staff
indicating he orally complained to Peterson about his placement in the
same cell with Walls prior to the incident. Peterson denies Indreland
ever complained to him about Walls. (Court Doc. 48–Peterson

Affidavit).

## IV.  RELIGIOUS CLAIMS

### A.  Free Exercise of Religion

The First Amendment to the United States Constitution states in pertinent part, "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof. . . ." In order for a religious claim to merit protection under this clause, the claim must first meet two criteria:  (1) the proffered belief must be sincerely held; and (2) "the claim must be rooted in religious belief, not in 'purely secular' philosophical concerns." Callahan v. Woods, 658 F.2d 679, 683 (9th Cir. 1981).   That is, "whether the plaintiff's claim is related to his sincerely held religious belief." Malik v. Brown, 16 F.3d 330, 333 (9th Cir. 1994); see also Shakur v. Schriro, 514 F.3d 878 (9th Cir. 2008).  If a regulation infringes on a "sincerely held religious belief" it is only valid if it is "reasonably related to legitimate penological interests." Turner v. Safley, 482 U.S. 78, 89, 107 S.Ct. 2254, 96 L.Ed.2d 64 (1987).

To merit protection under the First Amendment, a religious claim

must be sincerely held and must be "rooted in religious belief, not in 'purely secular' philosophical concerns." Malik v. Brown, 16 F.3d 330, 333 (9th Cir. 1994) (internal citations omitted); Shakur, 514 F.3d at 885 (9th Cir. 2008). The parties do not discuss whether Satanism is a religion, whether Indreland was a practicing Satanist, or whether the various regulations at issue actually infringed on Indreland's sincerely held religious beliefs. Accordingly, the Court will assume such for purposes of this motion.

The relevant Turner factors in determining whether a regulation, or its application in a particular situation, is reasonable are as follows: (1) whether there is a valid, rational connection between the regulation and a legitimate and neutral government interest, (2) whether there are alternative means of exercising the constitutional right, (3) the impact the accommodation of the right will have on prison staff and other prisoners, and (4) whether the regulation is an exaggerated response to prison concerns, in light of readily available alternatives. Turner, 482 U.S. at 89-91.

B.     Religious Land Use and Institutionalized Persons Act

The Religious Land Use and Institutionalized Persons Act, 42 U.S.C. § 2000cc et seq. , provides in relevant part:

> No government shall impose a substantial burden on the religious exercise of a person residing in or confined to an institution . . . even if the burden results from a rule of general applicability, unless the government demonstrates that imposition of the burden on that person
>       (1) is in furtherance of a compelling governmental interest; and
>       (2) is the least restrictive means of furthering that compelling governmental interest.

42 U.S.C. § 2000cc-1(a).

Claims brought under RLUIPA are subject to a strict scrutiny standard, as opposed to the reasonableness standard employed in cases involving constitutional violations. See Henderson v. Terhune, 379 F.3d 709, 715 n. 1 (9th Cir. 2004).  RLUIPA mandates a stricter standard of review for prison regulations that burden the free exercise of religion than the reasonableness standard outlined above under Turner. Shakur, 514 F.3d at 888.

To establish a RLUIPA violation, the plaintiff bears the initial burden to prove the defendants' conduct places a "substantial burden"

on his "religious exercise." Warsoldier v. Woodford, 418 F.3d 989, 994 (9th Cir. 2005). Once the plaintiff establishes a substantial burden, defendants must prove the burden both furthers a compelling governmental interest and is the least restrictive means of achieving that interest. Id. at 995. RLUIPA is "to be construed broadly in favor of protecting an inmate's right to exercise his religious beliefs." Warsoldier, 418 F.3d at 995 (citing 42 U.S.C. § 2000cc-3(g)).

RLUIPA broadly defines "religious exercise" as "'any exercise of religion, whether or not compelled by, or central to, a system of religious belief.' " Warsoldier v. Woodford, 418 F.3d 989, 994 (9th Cir.2005) (quoting 42 U.S.C. § 2000cc-2(a)). In fact, RLUIPA "bars inquiry into whether a particular belief or practice is 'central' to a prisoner's religion." Cutter v. Wilkenson, 544 U.S. 709, 725, n. 13 (2005).

The Ninth Circuit defines substantial burden as one that is "'oppressive' to a 'significantly great' extent. A 'substantial burden, on 'religious exercise' must impose a significantly great restriction or onus upon such exercise." Warsoldier, 418 F.3d at 995 (quoting San Jose

Christian College v. City of Morgan Hill, 360 F.3d 1024, 1034 (9th Cir. 2004)).  The burden must prevent the plaintiff "from engaging in [religious] conduct or having a religious experience." Navajo Nation v. U.S. Forest Service, 535 F.3d 1058, 1091 (9th Cir. 2008) (internal citations omitted).

C.  Medallion

Defendants have the burden to establish a "common-sense" connection between their policy and a legitimate penological interest. See Frost v. Symington, 197 F.3d 348, 357 (9th Cir. 1999).  If Defendants do so, Indreland must present evidence refuting the connection.  Id.  Defendants must then present enough counter-evidence to show the connection is not "so remote as to render the policy arbitrary or irrational." Id.

In Cutter v. Wilkenson, 544 U.S. 709, 722, 125 S.Ct. 2113 (2005), the Supreme Court acknowledged that "maintain[ing] good order, security and discipline, consistent with consideration of costs and limited resources," is a compelling government interest.  The Court must exhibit a "particular sensitivity to security concerns" and be

"mindful of the urgency of discipline, order, safety, and security in penal institutions." Cutter, 544 U.S. at 722-23. It is undisputed that prison security is a legitimate penological interest. See Turner, 482 U.S. at 91; Mauro v. Arpaio, 188 F.3d 1054, 1059 (9th Cir. 1999) (en banc), cert. denied, 529 U.S. 1018, 120 S.Ct. 1419, 146 L.Ed.2d 311 (2000) ("It is beyond question that both jail security and rehabilitation are legitimate penological interests.").

Several Defendants testified by affidavit that the Facility does not allow detainees to have medallions with chains that are strong enough to be used to strangle someone. (Affidavits of Wong (Court Doc. 42), Pluhar (Court Doc. 39), and Gatlin (Court Doc. 38)). Indreland disputes this argument stating the chain was a standard 24" figaroa chain accepted by other institutional vendors and that other inmates in the facility were allowed to have similar chains. Indreland does not dispute that the chain could have been used to strangle someone; nor did he identify other inmates who purportedly had such chains.

The Court finds there is no genuine issue that the Detention Facility had a legitimate penological interest in denying Indreland his

chain.  As Indreland presented no argument regarding alternative means of practicing his religion and he made no attempts to request any such alternatives, summary judgment should be granted on this issue.

D.  Satanic Bible

The County Defendants assert the decision to not give Indreland the Satanic Bible was Chaplain Kinser's; Kinser asserts it was the County's.  No Defendant presented Indreland a reason for the denial of the Bible.

Detention Facility's policy 7-05-01.00 (2) provides:  "The exercise of religious beliefs shall be limited only by legitimate security and operational considerations."  (Court Doc. 39, p. 13).  The County Defendants argue in their brief that the compelling reason to not allow detainees to have the Satanic Bible was for safety concerns because, "The Satanic Bible advocates violence, manipulation, disregard for authority and revenge." (Court Doc.  37, p. 14).  But Defendants cite no evidence for this proposition, nor is there anything in the record to indicate that this was the reason Indreland's request was denied.

The Court understands that this justification has been upheld by a number of other courts finding there is a legitimate penological interest in not allowing inmates access to the Satanic Bible.  See Carpenter v. Wilkinson, 946 F.Supp. 522, 529-30 (N.D.Ohio 1996); McCorkle v. Johnson, 881 F.2d 993, 995-96 (11th Cir. 1989) (exclusion of Satanic publication was reasonable in part because "[i]t is an informed and measured response to . . . the potential disorder that it might cause within the prison"); accord Burton v. Frank, No. 03-C-374-C, 2004 WL 1176171, at * 4-6 (W.D.Wis. May 20, 2004); Doty v. Lewis, 995 F.Supp. 1081 (D.Ariz. 1998); Winford v. Frank, 2008 WL 359728 (E.D.Wis. 2008); Hendrickson v. Caruso, 2008 WL 623788 (W.D.Mich. 2008).  But there is also authority for finding no such legitimate penological interest.  See Semla v. Snyder, 2006 WL 1465558 (S.D.Ill. 2006) (inmate's rights under the First Amendment violated when guard confiscated the Satanic Bible from inmate); Howard v. U.S.A., 864 F.Supp. 1019 (D.Col. 1994) (injunction granted requiring federal correctional institution to allow plaintiff the time, space, and implements to perform his Satanist rituals).

No party here presented evidence as to whether there was a legitimate penological reason for not allowing the Satanic Bible, whether there were alternative means for Indreland to exercise his constitutional right, the impact of allowing the Satanic Bible in the facility, whether the denial of the Satanic Bible was an exaggerated response to jail concerns, or whether the denial of the Satanic Bible was the least restrictive means of meeting the compelling state interest.  Therefore, the parties will be given an opportunity to provide supplemental briefing and evidence on these issues.

In addition, Defendants testified that Indreland made no attempt to obtain the book on his own by trying to purchase it from an outside source such as Barnes and Nobel or Amazon.  (Court Doc. 39–Pluhar Affidavit, p. 2).  The Detention Facility was not required to purchase religious materials for Indreland at their own expense.  See Cutter v. Wlikinson, 544 U.S. 709, 125 S.Ct. 2113, 161 L.Ed.2d 1020 (2005)(RLUIPA does not require a State to pay for an inmate's devotional accessories); Charles v. Verhagen, 348 F.3d 601, 605 (7th Cir. 2003)(overturning prohibition on possession of Islamic prayer oil

but leaving inmate-plaintiff with responsibility for purchasing the oil);

Frank v. Terrell, 858 F.2d 1090 (5th Cir. 1988) (rejecting claim of

Jewish inmate that prison must provide him free religious books and

materials); Mack v. Reynolds, 2000 WL 1808277 (N.D.Tex. 2000)

("There is no legal or constitutional requirement that inmates be

provided with religious materials at government expense."); and Cruz

v. Beto, 405 U.S. 319, 92 S.Ct. 1079, 1082, 31 L.Ed.2d 263 (1972)

(Burger, C.J., concurring) ("There cannot possibly be any constitutional

or legal requirement that the government provide materials for every

religion and sect practiced in this diverse country.  At most, [religious]

materials cannot be denied to prisoners if someone offers to supply

them.").

Indreland presented no evidence that he attempted to secure the

Satanic Bible from other sources or whether he had access to any such

sources.  The Court will allow Indreland to provide further briefing on

this issue as well.

E.  Religious Greeting Cards

The Facility has no records that Indreland was provided religious

greeting cards by the Facility or that Indreland ever complained about being provided religious greeting cards by the Facility.  Indreland claims that three times between April 1, 2007 and May 15, 2007, the Facility provided him with religious greeting cards during the regular distribution of mail to detainees.  According to Indreland, Joseph Stutz was the night officer who passed out mail on two of the occasions and he was unsure who delivered the third card.  He contends the overall message of the cards was that he was going to undergo a change and the writer was going to see to it that Indreland converted to Christianity.  (Court Doc. 58–Indreland response, p. 5).

Joseph Stutz filed an affidavit indicating he distributed mail to the detainees in the Detention Facility and on several occasions, distributed mail to the unit where Indreland was housed.

The Defendants filed affidavits in support of their Motion.  Each of Defendants' affidavits contained the following statement:  "I did not provide Indreland with any religious greeting cards and did not observe any staff members or detainees of the Facility provide him with religious greeting cards."  (Court Docs.  38-42, 44-50).

It is undisputed that no named Defendant took part in this activity or was aware of this alleged activity.  Indreland presented no evidence to dispute Defendants' sworn affidavits.  Indreland argues he filed grievances regarding the greeting cards and Defendants refuse to produce them in discovery.  But Indreland does not indicate to whom he complained and does relate this claim to any named Defendant. Therefore, his allegations against the named Defendants fail as a matter of law.

F.  Segregation

Defendants argue that on November 15, 2007, May 25, 2008, and June 3, 2008, after Indreland served his time in segregation, staff attempted to move Indreland to the general population of the Facility but Indreland refused to be moved.  (Court Doc. 45–Verhasselt Affidavit, p. 2; Court Doc. 46–Valdez Affidavit, p. 2; Court Doc. 47–Miller-Allen Affidavit, p. 2).

There is no dispute Indreland was placed in segregation as a result of two fighting incidents and he remained there until he was transferred to the Montana State Prison in July 2008.  While there may

be a dispute as to why Indreland was not moved out of segregation after his disciplinary period was over, it is not material since Indreland presents no evidence to suggest the failure to move him was based upon his religion.

This claim fails as a matter of law.

## VI.   FAILURE TO PROTECT

Indreland was advised in the court's prescreening order that he could not maintain a failure to protect claim if he were the aggressor in the incident.  An infraction hearing was held on October 15, 2007 regarding the incident with Inmate Walls.  Indreland plead guilty and stated, "He is disrespectful – blatant disrespect and I could not deal with it." (Court Doc. 55-2, p. 54).  Indreland argues in his response brief that the incident was in self-defense and that Inmate Walls admitted in his statement to Officer Pauley that he was "in Indreland's face."  In an officer's report dated October 14, 2007, Inmate Walls was quoted as saying, "All I did was reach over to take his tray and he, I got hot coffee spilled on me." (Court Doc. 55-1, p. 52).  Walls denied hitting Indreland.  Indreland does not deny being the initiator and he does not

dispute the guilty finding.  He only argues his cellmate was disrespectful and he acted in self-defense.  Given Indreland's guilty plea to the fighting charge, he cannot sustain a failure to protect claim. This claim fails as a matter of law.

## VII.  DEFENDANTS BELL AND WESTON

Section 1983 imposes liability upon state actors only when their personal conduct violates a plaintiff's constitutional rights.  Monell v. Department of Social Services, 436 U.S. 658, 691-94, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978).  Indreland contends in his Response to the County Defendants' Motion for Summary Judgment that Defendants Bell and Weston in their official capacities had a duty to oversee the functions and day to day practices at the Detention Facility.  He contends they are responsible for the behavior of those employed at the Detention Facility and that the rights of those housed there are not being violated.

Section 1983 will not impose liability on supervising officers under a respondeat superior theory of liability.  Monell, 436 U.S. at 691-94.  That is, Defendants Bell and Weston cannot be held liable just

because they oversee the Yellowstone County Detention Facility.

Supervising officers can be held liable under section 1983 "only if they

play an affirmative part in the alleged deprivation of constitutional

rights." King v. Atiyeh, 814 F.2d 565, 568 (9th Cir. 1987).  In order to

be liable, a supervising officer has to "set in motion a series of acts by

others  . . . , which he knew or reasonably should have known, would

cause others to inflict the constitutional injury." Larez v. City of Los

Angeles, 946 F.2d 630, 646 (9th Cir. 1991) (internal quotations

omitted).  Indreland presented no evidence that either Bell or Weston

set in motion a series of action which they reasonably should have

known would cause others to inflict constitutional injury.  These

Defendants should be dismissed.

## VIII.  DEFENDANT KINSER

Indreland sues Defendant Chaplain Kinser for denying him a

Satanic Bible.  Indreland argues the Inmate Rules and Regulations

state that "religious material such as a bible may be requested by

submitting an inmate request form to the facility Chaplain."  In

addition, he points to the response to his June 3, 2008 grievance, "Per

our facility Chaplain – Satanism is not encouraged in our facility.  You will not be given your necklace nor items pertaining to Satanism.  This is final administration."  (Court Doc. 34-3, p. 13).

Kinser defends against Indreland's allegations by stating he does not set Facility policy and that "a prison chaplain who engages in purely ecclesiastical functions does not act on behalf of the state even if he is a full-time employee of the state."  (Court Doc. 33–Kinser Brief, p. 5).  Based on the authority cited, it appears Kinser is arguing he was not acting under color of state law and therefore not a proper Defendant under Section 1983.  Although not specifically stated, Kinser cites an opinion from the Central District of California, Uhuru v. Moskowitz, 2009 WL 2020758 *8 (C.D. Cal. 2009), which raises this argument.

In order to state a claim under section 1983, a plaintiff must allege that:  (1) the defendants were acting under color of state law at the time the complained of acts were committed; and (2) the defendants' conduct deprived plaintiff of rights, privileges, or immunities secured by the Constitution or laws of the United States.

Karim-Panahi v. Los Angeles Police Dept., 839 F.2d 621, 624 (9th Cir. 1988); Haygood v. Younger, 769 F.2d 1350, 1354 (9th Cir.1985) (en banc), cert. denied, 478 U.S. 1020, 106 S.Ct. 3333, 92 L.Ed.2d 739 (1986).

It is undisputed that Kinser is an independent contractor and not an employee of Yellowstone County.  But as set forth in Uhuru and the cases cited therein, those facts are not alone determinative.  The Court may employ various tests in determining whether a person is acting under color of state law, including:  (1) the Public Function test-where a private actor exercises powers traditionally exclusively reserved to the State; (2) the Joint Action test-where a private actor is a willful participant in joint activity with the State or its agents; (3) the State Compulsion test-where the State exercises coercive power or provides such significant encouragement that the private actor's choice must be deemed to be that of the State; and (4) the Governmental Nexus test-where there is a sufficient nexus between the State and the challenged action such that the action of the private actor may be fairly treated as that of the State.  Johnson v. Knowles, 113 F.3d 1114,

1118-20 (9th Cir. 1997).

The United States Court of Appeals for the Ninth Circuit has not expressly addressed whether prison chaplains or clergy providing services to inmates are state actors under § 1983.  See Florer v. Congregation Pidyon Shevuyim N.A., 2007 WL 2745383 (W.D.Wash.).

The Uhuru case analyzes whether a Jewish Chaplain at a California prison was acting under color of state law when he exercised his religious judgment and determined the plaintiff was not entitled to a kosher diet based on differences between Judaism and Black Hebrews.  Uhuru and the cases cited therein involved a chaplain of a particular faith making a determination whether an inmate should receive the materials/diets associated with that faith.  See Montano v. Hedgepeth, 120 F.3d 844 (8th Cir. 1997)(prison chaplain, as head of the prison's Protestant congregation, denied plaintiff access to Protestant Christian ceremonies on the basis that the plaintiff was a Messianic Jew and not a full Protestant–the court applying the functional test of state action found that clergy perform functions independent of state control); Florer v. Congregation Pidyon Shevuyim, N.A., 2007 WL

2745383 (W.D. Wash. 2007)(Jewish chaplain who refused an inmate access to Jewish materials and a Jewish diet not a state actor under section 1983); Schilling v. Crawford, 2006 WL 1663827 (D.Nev. 2006)(Defendants' determination as to who may participate in Jewish ceremonies by virtue of their religion was not made under color of state law, but as an implementation of the Jewish faith).

Here there is a genuine issue of material fact whether Kinser made the decision to deny Plaintiff a Satanic Bible.  Although Kinser stated in his affidavit that he did not make this decision, there is a grievance response indicating, "Per our Facility Chaplain – Satanism is not encouraged in our facility.  You will not be given your necklace nor items pertaining to Satanism.  This is final per Administration." (Court Doc. 34-3 at p. 13.)  This statement suggests that Kinser was involved in the decision to deny religious materials to Indreland.  The decision was either based upon the mere fact that Indreland was a Satanist or based upon safety and security reasons –neither of which has been established on the current record.

Thus, this case is more aligned with Phelps v. Dunn, 965 F.2d 93

(6th Cir. 1992) as cited in Uhuru.  In Phelps, the prison chaplain barred the plaintiff from religious services because of the plaintiff's admitted homosexuality.  The prison warden issued a memorandum that no inmates should be refused religious services as a result of their sexual orientation.  The chaplain, however, barred the plaintiff notwithstanding the warden's directive.

As in Phelps, the YCDF had a policy that, "Every reasonable attempt shall be made by the staff to facilitate the free exercise of religious beliefs by the inmates."  (Court Doc. 34-2, p. 6).  Moreover, the position description for the Facility Chaplain states, "The ability to work with diverse groups including non-Christian, non-religious or off mainstream beliefs is essential."  (Court Doc. 34-1, p. 13).  See also West v. Atkins, 487 U.S. 42, 108 S.Ct. 2250 (1988)(physician under contract with prison to provide medical services on a part time basis acted under color of state law).

There is a genuine issue whether Chaplain Kinser was working in conjunction with detention center staff to deny Plaintiff his free exercise of religion and therefore, whether he could be considered a

state actor in these circumstances under the joint action test.

IX.  CONCLUSION

The Court will reserve ruling on Defendants McCave, Neiter, Pluhar, Wong, and Kinser's Motions for Summary Judgment on the Satanic Bible issue subject to supplemental briefing.

The County Defendants' Motion for Summary Judgment should be granted as to Indreland's claims regarding his medallion, the religious greeting cards, his placement in segregation, and the alleged failure to protect.  In addition, the Motion should be granted as to Defendants Bell, Weston for the reasons set forth above.  Because Defendants Peterson, Valdez, Butke, and Miller were named only with regard to Indreland's segregation and failure to protect claims, their motion should also be granted.

Based on the foregoing, the Court issues the following:

<u>ORDER</u>

1.  The parties shall have until February 12, 2010, to file supplemental briefing on the Satanic Bible issues as set forth above. Response briefs may be filed on or before February 26, 2010.

2.  On or before January 22, 2010, the parties shall notify the Court whether they would be interested in participating in a court-sponsored settlement conference in this matter.

## RECOMMENDATION

1.  The Yellowstone County Defendants' Motion for Summary Judgment (Court Doc. 35) should be GRANTED IN PART as to Indreland's claims regarding his medallion, segregation, failure to protect, and the placement of religious greeting cards.

2.  Defendants Bell, Weston, Peterson, Valdez, Butke, and Miller should be DISMISSED.

## NOTICE OF RIGHT TO OBJECT TO FINDINGS & RECOMMENDATIONS AND CONSEQUENCES OF FAILURE TO OBJECT

Pursuant to 28 U.S.C. § 636(b)(1), the parties may serve and file written objections to these Findings and Recommendations within fourteen (14) business days of the date entered as indicated on the Notice of Electronic Filing.  Any such filing should be captioned "Objections to Magistrate Judge's Findings and Recommendations."

A district judge will make a de novo determination of those portions of the Findings and Recommendations to which objection is

made.  The district judge may accept, reject, or modify, in whole or in part, the Findings and Recommendations.  Failure to timely file written objections may bar a de novo determination by the district judge and may waive the right to appeal the District Court's order.  Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

This Order is not immediately appealable to the Ninth Circuit Court of Appeals.  Any notice of appeal pursuant to Fed.R.Civ.P. 4(a)(1), should not be filed until entry of the District Court's final judgment.

DATED this 12th day of January, 2010.

/s/ Carolyn S. Ostby
United States Magistrate Judge